IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHELSEA D., a Minor, Individually | : | CIVIL ACTION |
| AND by and through her Parents | : | NO. 12-1554 |
| ROBERT D. and JOANNE D. | : | |
| | : | |
| v. | : | |
| | : | |
| AVON GROVE SCHOOL DISTRICT | : | |
| | : | |

O'NEILL, J.                                                                                      July 15, 2013

## MEMORANDUM

Now before me are cross-motions for judgment on the administrative record in a case

arising out of plaintiffs' claims under the Individuals with Disabilities Education Act (IDEA), 20

U.S.C. § 1400, et seq.[1] and its federal and state implementing regulations; Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794, and its federal and state implementing regulations;

the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101, et seq., and its federal

and state implementing regulations and Chapters 14 and 15 of the Pennsylvania Code.   For the

reasons that follow, I will grant defendant's motion and deny plaintiff's motion.

## BACKGROUND[2]

Plaintiff Chelsea D., a sixteen year old minor child of plaintiffs Robert D. and Joanne D.,

was enrolled in the defendant Avon Grove School District.  H.O.D. at 3, ¶ 1.  She "had a history

of receiving instructional supports in math before and after enrolling in the District in 4th

---

[1]        As amended by 20 U.S.C. § 601 et seq., the Individuals with Disabilities
Education Improvement Act of 2004.

[2]        Citations in this section will be to the Hearing Officer's Decision (H.O.D.
followed by page and, where appropriate, paragraph number), Notes of Testimony from the due
process hearing (N.T. followed by minuscript page and line number); parents' exhibits (P-
followed by exhibit and page number); and school district exhibits (S- followed by exhibit and
page number).  See Dkt. No. 12 (administrative record).

Grade."  Id. at 3, ¶ 3.  In seventh grade, Chelsea received a B- in "High Math."  S-1 at 10.

Chelsea also achieved a "proficient" score in math on the Pennsylvania System of School

Assessment (PSSA) test.  H.O.D. at 3, ¶ 4; see also S-6 at 5 (noting Chelsea's 1348 math score

on the March 31, 2008 PSSA).  Standardized Measures of Academic Progress testing that year

"yielded scores in the Average range on a test of Math ability, and within the High range on a

test of Reading and Writing."  S-1 at 10.

 Chelsea "was recommended for placement in Basic Pre-Algebra for 8th grade."  S-1 at

10.  Contrary to that recommendation, "[h]er parents signed a letter requesting Chelsea to be

placed in Pre-Algebra."  Id.; see also H.O.D. at 3, ¶ 6 ("Based upon Student's performance in 7th

Grade math, the District had recommended placement in the Basic Pre-Algebra math class for

8th grade, in which the concepts were taught at a slower pace than the Pre-Algebra math class in

which Student was placed when Parents overrode the District's recommendation.").  Enrolled in

the eighth grade pre-algebra course, and not the basic course, Chelsea's first and second quarter

math marks were, respectively, "D- (Does not do required homework)" and "D (Low test

scores)."  S-1 at 10.  She "became increasingly frustrated, despite informal supports and

strategies implemented by the 8th grade math teacher."  H.O.D. at 3, ¶ 6.  Chelsea's mother

testified that she and Chelsea's father "would work with her at home."  N.T. at 47:15-16.  They

"would sit down with her for hours trying to explain to her what she was – what she was doing in

class basically.  And at times, Chelsea would become very upset to the point where we would

have to stop working and give her a break and focus on something else."  Id. at 47:23-48:4.

 In November 2008, during her eighth grade year, Chelsea was diagnosed with attention

deficit hyperactivity disorder (ADHD) and prescribed medication.  H.O.D. at 4, ¶¶ 7-8.

Chelsea's parents had her "examined by a physician due to difficulties with organization and

memory, primarily manifested by [her] inability to complete school assignments and/or

forgetting to turn in assignments and frustration arising from the memory and organization

issues." Id. at 4, ¶ 8.  "Teacher input . . . indicated that Student's inattentiveness decreased and

classroom performance improved after beginning medication."  Id. at 4, ¶ 9.

Also in November 2008, Chelsea's parents asked the District to evaluate her to determine

her eligibility under IDEA for an Individualized Education Plan (IEP).  Id. at 4, ¶ 7.  At her

parents' request, Chelsea was also "referred to the Instructional Support Team . . . for processing

and organization issues."  Id.

The District's evaluation report, completed on February 1, 2009,[3] S-1 at 4, noted that

Chelsea faced challenges in math, explaining that on one standardized test Chelsea exhibited a

"significant and rare discrepancy between her measured ability and performance on [a] math

reasoning subtest" and that on a further standardized test, she fell "in the average range" but had

"a significant discrepancy . . . between [her] measured ability and her performance in the area of

math reasoning."  Id. at 12; see also H.O.D. at 4, ¶ 10 ("The results of standardized tests of

cognitive potential, which placed Student in the average range, compared to standardized

measures of achievement revealed a significant discrepancy, also described as 'rare,' between

ability and achievement in math reasoning.").  The report also noted that certain teachers had

reported deficiencies in Chelsea's classroom performance and participation, particularly in math.

S-1 at 5-7.

The District's evaluation concluded, however, "that Chelsea [wa]s not demonstrating an

---

[3]       Contrary to plaintiffs' argument, see Dkt. No. 13 at ECF p. 6, 13, 20, the District
could not have considered Chelsea's eighth grade PSSA score, which rated her as "proficient" in
math, when made its conclusions regarding her eligibility for services under IDEA as the PSSA
was administered in March 2009, after Chelsea's evaluation report was completed.  See S-6 at 4
(identifying the date of the PSSA as March 16, 2009).

academic need in any academic area, as evidenced by her performance on standardized

assessments, recommendations by the Instructional Support Team, and classroom performance,"

and that "Chelsea therefore [did] not meet the criteria . . . of a student with a Specific Learning

Disability and [was] not in need of specially designed instruction." Id. at 17; see also H.O.D. at

4, ¶ 11 (noting the conclusion of the District's psychologist supervisor that Chelsea's "grades

and statewide achievement test scores established that Student had insufficient academic need for

IDEA services, since modifications to the curriculum were not necessary for Student to

successfully access the regular curriculum and meet District educational standards . . . at

Student's grade level."); N.T., at 156:18-157:2 (questioning the District's psychologist, "[D]id

you ever say that the discrepancy wasn't enough?  A.  No. . . . Q.  What was the reason why she

wasn't eligible?  A.  There wasn't a large enough academic need as stated in the evaluation

report.").  Instead, the Multidisciplinary Evaluation Team recommended that "Chelsea [was]

eligible for a 504 Service Agreement to address her classroom difficulties associated with her

ADHD."  S-1 at 17; see also H.O.D. at 4, ¶ 12 (noting that the District "determined that Student

would benefit from a §504 Service Agreement to address focus, attention and self-regulation

issues that could impact Student's academic achievement").

     Accordingly, on March 26, 2009, the District created a proposed 504 Service Agreement

for Chelsea.  Id. at 4, ¶ 13; S-2 at 16.  Chelsea's proposed 504 Service Agreement did not

provide for any specialized instruction in math.  S-3 at 18-20.  "Although Parents disagreed with

the District's [specially designed instruction] non-eligibility determination, . . . Parents made a

number of suggestions concerning accommodations to address academic issues related to

[Chelsea's] ADHD.  District staff drafted a proposal for a § 504 Service Agreement that included

Parents' requests and additional accommodations."  H.O.D. at 4, ¶ 13.  Chelsea's parents

accepted and agreed to the Service Agreement for eighth grade on April 15, 2009.  Id. at 5, ¶ 14;

S-2 at 30.

> The accommodations included in Student's §504 Service
> Agreement for both 8th and 9th grades included verbal prompts to
> initiate problem-solving skills and to retrieve and turn in
> completed work, repetition of newly taught concepts to assist in
> sustaining working memory, extended time for tests, quizzes and
> assignments, use of graphic organizers and visual aids when
> needed to improve understanding of concepts, assistance in
> breaking larger assignments into smaller segments, a homework
> log reviewed by teachers, checks for understanding, peer
> partnering at teacher discretion, explicit instruction in
> organizational skills, preferential seating, opportunities to use
> resources such as [Instructional Support Team] services, tutoring
> and guidance counselors, access to the District's online grading
> program to assist in home-school communication, monitoring of
> progress by the guidance counselor and notification of Parents if
> Student was failing a major subject in order to discuss options for
> support.

H.O.D. at 5, ¶ 15.

In eighth grade, accommodations in the 504 Service Agreement also included weekly

reports reviewed by the guidance counselor from Chelsea's math, science, social studies and

English teachers along with a second set of textbooks to keep at home.  Id. at 5, ¶ 16.  Chelsea's

> [p]arents considered the §504 Service Agreement in place during
> the 4th quarter of 8th grade helpful in addressing Student's focus
> and attention issues, although Student finished . . . with a D+ in
> math for the year.  Parents believed that the weekly reports from
> the guidance counselor concerning Student's completion of
> assignments and the one-on-one support Student received from
> teachers during the last period of the school day were particularly
> helpful in addressing Student's needs.

Id. at 5, ¶ 18.  In pre-algebra, Chelsea's "quarterly grades improved from 60% at the end of the

1st quarter to 67%, 73% and 72% for the 2nd, 3rd, and 4th quarters, respectively."  Id. at 5, ¶ 19.

Despite her low marks, Chelsea achieved a "proficient" score in math on the PSSA in eighth

grade.  Id. at 3, ¶ 4.

In ninth grade, Chelsea's 504 Service Agreement was revised to add "a provision for Student to identify 3 ways to self-advocate through the help of the [Instructional Support Team] and a provision for Student to check power school [sic] regularly to monitor class progress." Id. at 5, ¶ 17. On November 19, 2009, Chelsea's math teacher emailed her parents to let them know that Chelsea scored well on her quizzes and that she did "a nice thorough job of showing all her work. And except for one small error, the work was accurate. So I'm seeing improvement . . . ." S-3 at 23. He emailed Chelsea's parents again on December 11, 2009, writing that Chelsea "ended up with an 83% on the chapter 4 test. So overall, she's at an 84% for the marking period. And she's participating more and more." Id. at 24. Based on Chelsea's reported performance, the Hearing Officer concluded that

> [o]verall, Student's grades showed improvement in 9th grade . . . .
> Student struggled in math again, but enjoyed the class. The math
> teacher worked with Student and provided extended time for
> testing. Student's final grade in math for 9th grade was a B- . . . .
> Student also received a final grade of B- in two other classes in 9th
> Grade, a B+ in one class and A grades (A-, A and A+) in the
> remaining classes.

H.O.D. at 6, ¶ 21.

Chelsea's parents were concerned, however, "because [during ninth grade] they were no longer receiving weekly progress reports from teachers or the guidance counselor. Some teachers reported that Student was not completing all assignments and Student was receiving some low grades on math tests and quizzes." Id. at 5, ¶ 20. Chelsea's mother emailed the District on December 29, 2009 asking to be notified "weekly concerning her missed assignments and future projects." S-3 at 26. In January 2010, Chelsea's mother emailed the District again saying that she "fe[lt] it [was] necessary to reinstate the weekly reports." Id. at 27. She wrote

that "until the accommodation is made, I am not signing the current plan and if necessary will seek legal advice in this matter." Id.

In a January 27 response to the concerns expressed by Chelsea's mother, a District administrator wrote that "although I know you feel strongly that a communication system like the one implemented in 8th grade is necessary, the data (including grades and assignment completion) indicates that a communication system is not necessary for Chelsea to assess [sic] the general education curriculum." S-2 at 30. The message concluded that "[w]hile you have stated that you will not be signing the current plan, the [District] will be implementing that plan as of Monday because it supports Chelsea's ability to access the general education curriculum." S-3 at 30.

The next communication in the administrative record between plaintiffs and the District is an April 5, 2010 email from Chelsea's mother to the District expressing concerns regarding Chelsea's visual/spatial awareness. S-4 at 1-2. On April 16, 2010 the District's Supervisor of Pupil Services sent an email to relevant teachers and administrators to inform them that Chelsea's "parents ha[d] requested review of her 504 service agreement." P-4 at 31. She wrote that Chelsea's parents were "requesting significant changes to the 504 service agreement, including but not limited to having teachers contact them when she gets below a B on any assignment or test." Id.

The District and Chelsea's parents met in April to review Chelsea's 504 Service Agreement because her parents had "requested a re-evaluation as they fe[lt] better home-school communication is needed." S-4 at 17. After the meeting the District completed a Section 504 Evaluation Report in which it noted that "Teachers report minimal effects of Chelsea's ADHD in the classroom. Chelsea has missed completing a few class work and homework assignments this

school year." Id. at 18  The report also noted that Chelsea's teachers "report that [she] is a very good student and is doing well in their classes.  No major concerns were noted." Id. at 17.

On April 23, after the meeting, the Supervisor of Pupil Services sent an email to relevant teachers and administrators in which she noted that Chelsea's mother "wants to put the responsibility of informing [Chelsea's parents] of missed or incomplete assignments on [the District].  She requested notification by email and an opportunity for Chelsea to make up [assignments that Chelsea missed or did not totally complete] for full credit." P-4 at 30.  The Supervisor of Pupil Services wrote that she "would not agree to these requests" and requested input on a proposed "compromise" whereby Chelsea's teachers would specifically ask Chelsea to write down her assignments in her assignment book for two weeks and allow Chelsea to "complete class work for homework when it is not completed and the assignment lends itself to that situation." Id.

Chelsea's science teacher responded to the email saying that she "agree[d] with [the Supervisor of Pupil Services] on both accounts" and that she "d[id] not have a problem with allowing Chelsea to complete class work at home." Id.  She continued that she "hope[d] that we can start an initiative to encourage Chelsea to ask teachers questions, let [them] know when she needs more time, or when she is confused."  In conclusion, she wrote that "[i]n my opinion we need to help Chelsea with some strategies to cope with ADD.  So far we have talked about accommodations, but I feel that she needs strategies." Id.

On April 29, 2010, the District sent plaintiffs a Permission to Evaluate, noting a "Parent request for evaluation to determine if Chelsea has any visual/perceptual disabilities that are impacting on her ability to access the general education curriculum." S-5 at 2.  Not having received the consent form, the District sent plaintiffs another form on May 13, 2010. Id. at 4-6.

Plaintiffs did not respond, N.T. at 89:1-12, and the District marked the second copy of the consent form as "considered, refused 5/27/12." S-5 at 5.

After the 2009-10 school year Chelsea's parents removed her from the District and enrolled her in 10th grade at the Avon Grove Public Charter School[4] for the 2010-11 school year.  N.T. at 58:1-3.  The Avon Grove Public Charter School provided Chelsea with an IEP.  Id. at 59:2-4; see also H.O.D. at 6, ¶ 22.  She was identified "as IDEA eligible in the primary category of [Other Health Impairment] due to ADHD, with a specific learning disability in math as a secondary eligibility category."  H.O.D. at 6 ¶ 22.

In 2011, Chelsea's parents obtained an Independent Educational Evaluation by Dr. Richard Hall, a certified school psychologist.  P-2 at 1.[5]  In his August 29, 2011 report, he wrote that "Chelsea was referred for evaluation to assess her skills in math and written expression."  Id. at 8.  He found that she was a "student with average intellectual ability."  Id. at 3.  With respect to her writing skills, he wrote that "[h]er skills in both contrived and spontaneous writing tasks are in the well above average range."  Id. at 8.  "In contrast, Chelsea demonstrate[d] significant challenges in mathematics reasoning."  Id. at 9; see also H.O.D. at 6, ¶ 24 (finding Hall "obtained significantly discrepant scores on standardized assessments of ability and achievement in the area of math reasoning").  His report concluded that "Chelsea's primary disability is Other Health Impaired (OHI) and her Secondary disability category is Specific Learning Disabilities

---

[4]        Chelsea's mother is a teacher at the charter school.  See N.T. at 60:7-22.

[5]        The District objects that Hall's evaluation "is neither 'accurate' nor 'appropriate' and cannot be relied upon."  Dkt. No. 16 at ECF p. 5 n. 4.  It contends that Hall's "evaluation was limited to specific areas of concern identified by plaintiffs," "included only a cognitive test, math and writing assessments, and a behavior rating scale completed by the Plaintiffs," and "did not include a classroom observation or teacher/school input."  Id.  Raising concerns about a potential conflict of interest, the District also notes that plaintiffs' attorneys referred them to Hall, and that Hall is plaintiffs' counsel's brother-in-law.  Id.

(SLD) in Mathematics Reasoning."  P-2 at 9.  Hall found that "Chelsea [would] require specially designed instruction in math [in] order to achieve meaningful progress within the general education math program at her school."  Id.

Hall recommended that Chelsea's progress in math be "measured weekly" and that the "data need to be shared with her parents on a weekly basis."  Id. at 10.  He suggested instructional approaches and specific "interventions material [that] should be used for remediating the gaps in her math knowledge."  Id.  He also recommended that Chelsea "needs adaptations and accommodations within the general education curriculum to address the effects of ADHD, including extended time for tests, quizzes and assignments, assistance in breaking larger assignments into smaller segments, checks for understanding, [and] taking tests and quizzes in a low distraction environment."  H.O.D. at ¶ 25; see also P-2 at 9.

On August 30, 2011, the day after Hall issued his report, plaintiffs filed a due process complaint notice against the District with the Office of Dispute Resolution.  Dkt. No. 14-1 at ECF p. 3.  On November 7, 2011, Anne L. Carroll, Esquire, the presiding Special Education Hearing Officer, held an evidentiary hearing.  Id.  By Decision and Order dated December 29, 2011, she found in favor of the District.  H.O.D. at 17.  The Hearing Officer decided that the District correctly concluded that Chelsea was not eligible for special education services and that her 504 Service Agreements were implemented and effective.  Id. at 2.

Specifically, with respect to the issue of whether Chelsea had a specific learning disability that would qualify her to receive specially designed instruction, the Hearing Officer concluded that the District found that Chelsea "met part of the criteria for eligibility in the SLD category, in that the District's evaluation revealed a significant discrepancy between student's ability and achievement in the area of math reasoning, as measured by standardized

-10-

assessments." Id. at 10.  She noted, that "[t]he District further concluded, however, that Student

did not meet the final criterion for IDEA eligibility because Student did not require adaptations

to content, methodology or delivery of instruction in order to meet grade level standards in the

general education environment." Id.  The Hearing Officer concluded that "[t]he record in this

case amply supported the District's conclusion with respect to IDEA eligibility under the SLD

disability category." Id.

With respect to the question of whether Chelsea had an other health impairment that

would qualify her to receive specially designed instruction, the Hearing Officer concluded that

"[n]one of the evidence produced by Parents came close to establishing that Student required

specially designed instruction to meet grade level academic standards because of the ADHD

diagnosis." Id. at 13.  She concluded that "the District was certainly not required to assist

student in reaching even higher levels of academic success by identifying a need for, and

providing, specially designed instruction when Student consistently met the District's

educational standards applicable to all students without special education." Id.

The Hearing Officer also concluded that the record did not support plaintiffs' claim that

the § 504 "Service Agreements provided to student to address the effects of ADHD were

ineffective." Id. at 14.  She concluded that "[a]lthough it is certainly understandable that caring

and concerned Parents want to do everything possible to minimize the effects of ADHD

symptoms and maximize their child's academic success, and that Parents want to closely monitor

progress, the District is not required to accede to all of Parents' requests." Id. at 15.  She noted

that "the record clearly establishes that Student was academically quite successful." Id. at 16.

Plaintiffs filed this action appealing the administrative decision on March 28, 2012.  In

their motion for judgment on the administrative record, plaintiffs ask the Court to reverse the

Hearing Officer's determination and find that the District acted in violation of its obligations under IDEA, Section 504 and the ADA when it found that Chelsea did not require specially designed instruction to address her diagnoses of attention deficit hyperactivity disorder and a learning disability in math reasoning and that the District therefore did not did not provide Chelsea with a free and appropriate public education as required pursuant to IDEA, Section 504 and the ADA.  See Dkt. No. 13 at ECF p. 3.  Plaintiffs also contend that the Hearing Officer, erred in her December 29, 2011 decision and order when she found that IDEA's statute of limitations limited their claims to those arising after February 11, 2009.  Id. at ECF p. 24. Plaintiffs ask the Court to award compensatory education to Chelsea and seek their reasonable attorney's fees and costs.  Id. at ECF p. 4.

In its motion for judgment on the administrative record, the District asks the Court to affirm the Hearing Officer's determination that:  (1) Chelsea did not require Specially Designed Instruction and was thus not an eligible student under IDEA; (2) Chelsea was not entitled to relief under Section 504 of the Rehabilitation Act; and (3) Chelsea's parents did not establish an exception to IDEA's presumptive statute of limitations.  See Dkt. No. 14-1.

## STANDARD OF REVIEW

"When a state educational agency's hearing officer has held a due process hearing to decide whether a student has been denied a FAPE, federal district courts have jurisdiction to review his [or her] decisions."  Xykirra C. v. Sch. Dist. of Phila., No. 12-4251, 2013 WL 1915656, at *4 (E.D. Pa. May 8, 2013), citing 20 U.S.C. § 1415(i)(2).  "When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010).  Under this standard, the Court must give "due weight"

to the administrative hearing officer's factual findings.  Id.  "Factual findings from the administrative proceedings are to be considered prima facie correct.  If a reviewing court fails to adhere to them, it is obliged to explain why.  The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities."  S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003) (citation and internal quotation omitted).  "The court's review of conclusion of law, however, requires no deference to the state hearing officer's legal determinations."  Xykirra C., 2013 WL 1915656, at *4, citing S.H., 336 F.3d at 271.  "Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate . . . ."  Bayonne, 602 F.3d at 564.  As the party challenging the outcome of the due process hearing, plaintiffs bear the burden of proof in this matter.  See D.K. v. Abington Sch. Dist., 696 F.3d 233, 243 (3d Cir. 2012) (citations omitted); see also Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012) ("the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged").

## DISCUSSION

### I.   IDEA Eligibility

In their motion for judgment on the administrative record, plaintiffs challenge the Hearing Officer's conclusion that Chelsea was not an eligible child with a disability under IDEA either by virtue of a specific learning disability in math or by reason of her ADHD, an other health impairment.  See Dkt. No. 13 at ECF p. 12.  In the District's motion for judgment on the administrative record, it asserts that the Hearing Officer found correctly that plaintiff did not require special education.  See Dkt. No. 14-1 at ECF p. 5.

IDEA was enacted to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  A "child with a disability" is defined as

> a child – (i) with intellectual disabilities, hearing impairments
> (including deafness), speech or language impairments, visual
> impairments (including blindness), serious emotional disturbance
> (referred to in this chapter as "emotional disturbance"), orthopedic
> impairments, autism, traumatic brain injury, *other health
> impairments*, or *specific learning disabilities*; *and* (ii) who, by
> reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A) (emphasis added).  "Written in the conjunctive, the statute should not be read to protect children with an impairment but not requiring special education."  D.S. v. Neptune Twp. Bd. of Educ., 264 F. App'x 186, 189 (3d Cir. 2008).  "Special education" is defined as "specially designed instruction to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29).  "There is no precise standard for determining whether a student is in need of special education, and well-settled precedent counsels against invoking any bright-line rules for making such a determination."  W. Chester Area Sch. Dist. v. Bruce C., 194 F. Supp. 2d 417, 420 (E.D. Pa. 2002).

## A.    Specific Learning Disability

In their motion for judgment, plaintiffs assert that the Hearing Officer erred in finding "that because Chelsea was able to 'pass' math in her 8th grade year . . . she did not require Special Education in this area."  Dkt. No. 13 at ECF p. 19.  The District argues that "Plaintiffs are wrongly focused on a single . . . factor with respect to Student's aptitude-achievement testing discrepancy in math reasoning."  Dkt. No. 14-1 at ECF p. 7.

In its evaluation of Chelsea, the District was required to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . whether the child is a child with a disability . . . ." 20 U.S.C. § 1414(b)(2).  In accordance with Section 1414, Chelsea was evaluated using a variety of tests and assessments, including her performance on standardized assessments, her classroom performance, and recommendations from the Instructional Support Team.  N.T. at 117:6-13; 145; see also id. at 145:2-9 ("Q.  And so you'd also look at grade performances and classroom performance, correct?  A.  Correct.  Q.  And you would look at other standardized testing that may have been done, correct?  A.  Correct.").  The school psychologist testified that to determine whether Chelsea had a need for special education, the District would consider "state- and age-approved standards such as the PSSA, 4Sights, how their – a history of performance in the classroom, and also if they required goals in the [Instructional Support Program]."  Id. at 148:18-149:2.  Asked whether "grades in and of themselves [could] indicated whether a child is making meaningful educational progress,"  the school psychologist testified "[b]y itself [sic] no.  But it is a major part.  Grades are part of meaningful educational progress or one indicator of meaningful educational progress."  Id. at 152:1-8.

In its evaluation, the District wrote that "[a]lthough current testing indicated a significant and rare discrepancy between achievement and ability, Chelsea is not demonstrating an academic need in any academic area, as evidenced by her performance on standardized assessments, recommendations by the Instructional Support Team and classroom performance."  S-1 at 17. The District concluded that Chelsea did "not meet the criteria of Chapter 14 of PA state law or

IDEIA of a student with a Specific Learning Disability[6] and is not in need of specially designed education." Id.

The Hearing Officer did not go so far as to conclude that Chelsea did not meet the criteria for a student with a specific learning disability. Instead, she found that "[t]he record in this case amply supported the District's conclusion with respect to IDEA eligibility under the SLD disability category. . . . Student fully participated in both regular education classes at the age-appropriate grade level and in statewide assessments, and except in two instances, met or exceeded appropriate curriculum-based standards." H.O.D. at 10. She concluded that "[s]ince Student succeeded quite well in meeting the District's educational standards applicable to all students at the same grade level without specially designed instruction, the District appropriately concluded that Student did not need special education 'by reason of' the discrepancy between ability and a standardized measure of achievement in math reasoning." Id. at 12-13. I concur with the Hearing Officer's conclusion.

Even if the Hearing Officer had found that Chelsea had a specific learning disability in math reasoning based on a severe discrepancy between her ability and achievement in math reasoning based on standardized assessments, I find that the record evidence demonstrates that the Hearing Officer was justified in finding that Chelsea was not a "student with a disability" eligible for specially designed instruction because Chelsea's grades and testing showed that she did not need special education by reason of any specific learning disability she may have had in

---

[6] The District concedes that "standardized testing indicate[d] that Student had a discrepancy in math reasoning. Dkt. No. 14-1 at ECF p. 7. Asked at the due process hearing whether she had "ever sa[id] that the discrepancy wasn't enough" to warrant a finding of a specific learning disability, the school psychologist replied, "[n]o." N.T. at 156:18-20. Asked whether she had ever heard the District's Supervisor of Pupil Services "say that the discrepancy wasn't enough," the school psychologist again replied, "[n]o." Id. at 156:21-23. Instead she confirmed that Chelsea "wasn't found eligible" because "[t]here wasn't a large enough academic need . . . ." Id. at 156:24-157:2.

math reasoning.  Cf. Jaffess v. Council Rock Sch. Dist., No 06-0143, 2006 WL 3097939, at *7

(E.D. Pa. Oct. 26, 2006) ("even assuming HJ suffers some level of learning disability, the

evidence fails to establish that such disability interferes with HJ's ability to benefit meaningfully

from an educational program without [specially designed instruction]").

      In the District's evaluation, Chelsea was described by her teachers as "showing

improvement in all primary subject areas."  S-1 at 5.  Her teachers did note that "[i]n math,

Chelsea [was] performing slightly below grade level."  Id.  Chelsea's D- in the first semester of

eighth grade pre-algebra could be attributed to "a failure to complete homework assignments."

Id. at 16.  And despite her reported poor performance in math class, Chelsea received a total

score of "proficient" on a 4Sight Mathematics assessment administered in September and

December of 2008.  Id. at 7.  The District reported that "Chelsea's overall math ability according

to the 4Sight Assessments appears to be at the basic to proficient level. . . .  [I]t is important to

note that the material contained on the 4Sight Assessment is material to be learned by the end of

the school year."  Id. at 8.  As noted by the Hearing Officer, Chelsea's third quarter grade in

math improved to a 75% and her fourth quarter grade was a 72%.  H.O.D. at 5, ¶ 19.  The

Hearing Officer acknowledged that Chelsea's "continuing struggles with math in 8th grade, and

no doubt, the 1st quarter math grade of 60% obviously did raise significant concerns for parents .

. . ."  Id. at 11.  She explained, however, that "8th grade was the only time that Student's math

grade was below average."  Id. at 12.  She noted that Chelsea, "with average intellectual potential

and a measurably significant weakness in math reasoning, was placed in grade level, regular

education math classes, and except in a single school year, achieved above average grades

without any modifications to the 'content, methodology or delivery of instruction.'"  Id. at 12,

citing 34 C.F.R. § 300.39(b)(3).  On these facts, plaintiffs have not met their burden to establish

that the Hearing Officer wrongly determined that Chelsea did not require special education by reason of a specific learning disability in math reasoning.[7]

### 2.       Other Health Impairment

A child with an "other health impairment" also satisfies the first prong of the definition of a child with a disability under IDEA.  20 U.S.C. § 1400(d)(1)(A)(i).  Under IDEA's federal implementing regulations, an ADHD diagnosis constitutes an Other Health Impairment.  See 34 C.F.R. § 300.8(c)(9)(i)-(ii).  To qualify as a child with a disability, however, "[i]t is insufficient that the child merely has a statutorily recognized condition, as there must be a causational nexus between that condition and the child's educational progress. . . .  Without evidence of educational performance issues, the diagnosis of a recognized condition is inadequate to trigger IDEA protections."  Munir v. Pottsville Area Sch. Dist., No. 10- 0855, 2012 WL 2194543, at *12 (M.D. Pa. June 14, 2012).  The Hearing Officer concluded that despite Chelsea's ADHD diagnosis, "the District was correct in determining that Student did not meet the need for special education eligibility criterion under the OHI category."  H.O.D. at 13.  She noted that "[b]etween 7th and 9th grades, Student received only one 'C' and one C+ on the final grade reports, both in 7th grade. . . .  All other grades, with the exception of the 8th grade D+ in math, were in the A and B ranges."  Id.

---

[7] West Chester Area Sch. Dist. v. Chad C., 194 F. Supp. 2d 417 (E.D. Pa. 2002), a case relied on by plaintiffs, is distinguishable on its facts.  In Chad C., the student had a severe discrepancy in reading, spelling and math and his grades "dropped significantly over the course of the academic year," Id. at 419.  Further, "the Appeals Panel gave no justification for disregarding the significant discrepancies, as found by the District, between Chad's high verbal IQ and lower performance IQ, and between his verbal IQ and basic reading skills, spelling, and math reasoning."  Id. at 421.  In this case Chelsea's math grades showed improvement in the second half of the eighth grade year.  Also, the Hearing Officer provided an explanation for her finding that Chelsea did not require special education despite a discrepancy between Chelsea's achievement and ability in math reasoning.

In <u>S. v. Wissahickon Sch. Dist.</u>, No. 05-1284, 2008 WL 2876567, at *6 (E.D. Pa. July 24, 2008) <u>aff'd sub nom.</u> <u>Richard S. v. Wissahickon Sch. Dist.</u>, 334 F. App'x 508 (3d Cir. 2009), the District Court held that "even a medical diagnosis of ADHD would not automatically qualify a student for special education."  Finding that it could "not conclude that the District failed to timely identify Richard as a disabled child in need of special education," the Court explained that there was an

> absence of evidence that Richard was eligible for special education" where "[t]hroughout the third, fourth, fifth, and sixth grades, Richard performed well academically and achieved high grades.  Although his grades declined in the seventh and eighth grades, Richard's teachers observed continued educational progress, and attributed his underachievement primarily to a lack of homework completion.

<u>Id.</u>  Affirming the District Court's decision, the Court of Appeals found that

> the record demonstrate[d] that the District Court considered more than Richard's academic ability and achievement.  The District Court quoted and credited the hearing officer's conclusion predicated on testimony by Richard's teachers that Richard was not a student who had problems with attention, impulsivity, or hyperactivity during the relevant period. . . . Indeed, the District Court pointed to extensive evidence in the record that, in the seventh and eighth grades, Richard was perceived by professional educators to be an average student who was making meaningful progress, but whose increasing difficulty in school was attributable to low motivation, frequent absences, and a failure to complete homework.

<u>Richard S.</u>, 334 F. App'x at 511.

Here, as in <u>Richard S.</u>, there is sufficient evidence in the record to support the Hearing Officer's finding that Chelsea did not need specially designed instruction by reason of her diagnosis with ADHD.  In the District's evaluation, Chelsea's

> reading decoding and reading comprehension skills [were] slightly above grade level.  She exhibit[ed] proficient writing skills and display[ed] particular strength in the quality of her writing as well

as in the completion and quality of her social studies work.
Chelsea ha[d] recently shown strength in her classroom
participation in science.

S-1 at 5. The Instructional Support Team concluded that "Chelsea [was] able to access the

curriculum in all of her classes and off task behaviors [did] not appear to be interfering with her

progress." Id. at 9. On the WRAML-2, a memory and learning assessment, Chelsea had scores

for verbal memory, attention/concentration and working memory within the average range. Id. at

13. Her visual memory score was within the high average range. Id. "Overall, Chelsea

performed in the Average to High Average range on each of the core memory subtests . . .

suggest[ing] that Chelsea . . . possesse[d] adequate memory abilities and an intact ability to learn

and acquire new information." Id. Ultimately, the District concluded that although Chelsea

"may exhibit symptoms characteristic of ADHD, such as inattention and issues with working

memory in the classroom setting," she was "able to benefit from the general education program

with accommodations . . . ." Id. at 17.

      As the Hearing Officer wrote, "the District was certainly not required to assist Student in

reaching even higher levels of academic success by identifying a need for, and providing,

specially designed instruction when Student consistently met the District's educational standards

applicable to all students without special education." H.O.D. at 13. An IEP "provides a 'basic

floor of opportunity' but not necessarily the optimal level of services.'" Mary Courtney T. v.

Sch. Dist. of Phila., 575 F.3d 235, 251 (3d Cir. 2009), quoting Holmes v. Millcreek Twp. Sch.

Dist., 205 F.3d 583, 590 (3d Cir. 2000) (further citations omitted).

      I will enter judgment in favor of the District with respect to plaintiff's IDEA-based

claims.

**II.      Availability of Relief Under Section 504**

Section 504 prohibits discrimination on the basis of disability by programs that receive federal funds.  29 U.S.C. § 701 et seq.  To prevail on their Section 504 claim, plaintiffs must prove, inter alia, that Chelsea was excluded from participation in, denied the benefits of or subject to discrimination at school.  <u>See, e.g.</u>, <u>Ridgewood Bd. of Educ. v. N.E.</u>, 172 F.3d 238, 247 (3d Cir. 1999); <u>Andrew M. v. Del. Cnty. Office of Mental Health and Mental Retardation</u>, 490 F.3d 337, 350 (3d Cir. 2007).  Section 504's implementing regulations require the District to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature of severity of the person's handicap."  34 C.F.R. § 104.33(a).

Because I have found that the record supports the Hearing Officer's finding that Chelsea was not an eligible child with a disability under IDEA, plaintiffs cannot rely on an IDEA violation to support their contention that the District violated its Section 504 obligations to Chelsea.  <u>See, e.g.</u> Dkt. No. 13 at ECF p. 25-26 (arguing that "the District's failure to identify Chelsea as an eligible student under IDEA . . . constituted a violation of both IDEA and Section 504"); Dkt. No. 15 at WECF p. 4 ("Because Plaintiffs in this matter established that Chelsea was denied a FAPE, they clearly established that the District also committed a violation of Section 504 . . . .").  Absent their ability to prove that the District violated Chelsea's rights under IDEA, "plaintiff[s] must still prove that there was a violation of [Section 504]." <u>Andrew M.</u>, 490 F.3d at 349 (3d Cir. 2007).

Plaintiffs also contend that "[t]he Hearing Officer's conclusion that Chelsea's Section 504 Service Agreements were appropriate and effective is . . . incorrect."  Dkt. No. 13 at ECF p. 22.  They assert that "Chelsea's Section 504 Agreement did not help her to make reasonable

educational progress in her 9th grade year in the area of math." Id. at ECF p. 23.  The District

contends that the Hearing Officer was correct in finding that Chelsea received an appropriate

education under Section 504.  Dkt. No. 14-1 at ECF p. 11.  I agree with the District.

Under Section 504, an appropriate education is defined as "the provision of regular or

special education and related aids and services that (i) are designed to meet individual

educational needs of the handicapped persons as adequately as the needs of non-handicapped

persons are met and (ii) are based on adherence to the procedures that satisfy [certain]

requirements" regarding educational settings, evaluation and placement and procedural

safeguards.  34 C.F.R. § 104.33(b).  "To offer an 'appropriate' education under the

Rehabilitation Act, a school district must reasonably accommodate the needs of the handicapped

child so as to ensure meaningful participation in educational activities and meaningful access to

educational benefits."  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 280 (3d Cir. 2012) (citations

omitted); see also Centennial Sch. Dist. v. Phil L. ex rel. Matthew L., 799 F. Supp. 2d 473, 490

(E.D. Pa. 2011) (holding that to determine whether the student "was afforded an appropriate

education," the Court should consider "whether [the student] was provided significant learning

and conferred a meaningful benefit").  "There are no bright line rules to determine when a school

district has provided an appropriate education as required by § 504 and when it has not."  Molly

L. v. Lower Merion Sch. Dist., 194 F. Supp. 2d 422, 427 (E.D. Pa. 2002).  "§ 504 does not

mandate 'substantial' changes to the school's programs, and courts should be mindful of the

need to strike a balance between the rights of the student and her parents and the legitimate

financial and administrative concerns of the school district."  Ridley, 680 F.3d at 280-81

(alterations, internal quotation marks and citation omitted).

The Rehabilitation Act distinguishes "between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps," Se. Cmty. Coll. v. Davis, 442 U.S. 397, 410 (U.S. 1979), and Section 504 does not require the District "to provide [Chelsea] with the best possible education." Molly L., 194 F. Supp. 2d at 436. Instead, it requires the District "to supply . . . her with a community-financed education which was sufficiently 'appropriate' to . . . her personal learning requisites to enable . . . her reasonable access to an education similar, relative to . . . her individual academic potential and cognitive abilities, to that available to the average fellow student." Campbell v. Bd. of Ed. Of the Centerline Sch. Dist., 58 F. App's 162, 166 (6th Cir. 2003).

Plaintiffs have not met their burden to demonstrate that the accommodations provided to Chelsea in her eighth and ninth grade 504 Service Agreements were insufficient to ensure "meaningful participation in educational activities and meaningful access to educational benefits." Ridley, 680 F.3d at 280. They argue that "Chelsea's Service Agreements were clearly ineffective at least in the area of math, because Chelsea's math struggles continued during the entire time her Section 504 Service Agreements were in place." Dkt. No. 13 at ECF p. 26. But Chelsea's "struggles" in math do not equate to her failure to make "meaningful" educational progress when her math grade in fact improved once the Service Agreements were in place. Based on the administrative record, I find that the Hearing Officer had a sufficient basis upon which to conclude that Chelsea's Section 504 "Service Agreements were obviously effective based upon the objective criteria of Student's academic performance" and that "the District amply met [the] standard" requiring it "to provide accommodations and supports that allow[ed] Chelsea] to participate effectively in the regular education program despite the effects of" her ADHD. H.O.D. at 15.

### III.     Availability of Relief under the ADA

Because I find that the District did not violate its obligations pursuant to Section 504, I reach the same conclusion with respect to plaintiffs' ADA-based claims.  See Chambers v. Sch. Dist. of Phila., 587 F.3d 176, 189 (3d Cir. 2009) ("the same standards govern both the . . . RA and ADA claims"); McDonald v. Commw. of Pa., Dept. of Pub. Welfare, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same.").

### IV.     Statute of Limitations

Because I find that the District was correct in determining that Chelsea was not eligible for specially designed instruction under IDEA and that Chelsea's Section 504 Service Agreement properly allowed her to access the District's curriculum and educational programs, I need not reach the question of whether the Hearing Officer erred in finding that Chelsea's parents did not establish an exception to the statute of limitations for her IDEA and Section 504 claims such that those claims could reach events occurring prior to the 2009-10 school year.

### V.     Entitlement to Compensatory Education

Because I find that Chelsea was not denied a FAPE under either IDEA or Section 504, I also find that she is not entitled to compensatory education.  See, e.g. C.W. ex rel. Louise W. v. Rose Tree Media Sch. Dist., 395 F. App'x 824, 828 (3d Cir. 2010) ("Given that she was not denied an appropriate education, the imposition of compensatory education would not further the purposes of IDEA . . . .").

An appropriate Order follows.